Okay, the next case today is a consolidated matter for one five zero six seven four four one five zero six seven five. And it's in Ray L.H. L.H. people of the state of Illinois and for the pellet. Mr. Mike Costello. And for the apple, we Mr. John Zimmerman. Mr. Costello, are you ready? Please record these are two consolidated cases where the parental rights of the respondent, Mr. mother. She gave birth to a child, which is one of the children here, the youngest child, and it showed positive drugs in the child. Immediately taken away for shelter care, along with the other child who is a little bit old, about four or five years. They could not find the respondent. He was living in Chicago. And finally, they obtained service by publication. He learned of this when the mother called a relative of the father and said, they've taken my children away again. And he then called DCFS and three service plans were instituted for him. He lived in Chicago. They set up visitation here in Springfield and after three, one short service plan, two the service plan showed interest and therefore moved on to a termination of his parental rights and thereafter, best interest here. The father had difficulty following the service plan. As to visitation, he was up in Chicago and it was a hardship for him to come down here, although granted, these are his children. Beyond that counsel, didn't DCFS offer to pay for his transportation costs every other week since he had represented he could afford to do the other week and so basically he was provided for? That's true, Justice. They did. And he missed, out of 45 visits, he missed, he only made seven. But as to that point, DCFS, he asked for reimbursement on a couple of the occasions and DCFS never paid him. Still haven't paid him for their alleged reimbursement for the trips. Be that as it may, he did not come down but for seven times. He said he had difficulties caring for his grandmother. He had to wash and bathe her and do things for her. He was employed by his father who had real estate properties and he just didn't get down to visit the children. Well, counsel, in this case the standard of review is against the manifest weight of the evidence, correct? That's correct, Your Honor. I mean, your client did so little, really I can't think of anything that your client actually completed. I mean, how can we say that the trial court's decision was against the manifest weight of the evidence? By this, he had reasons why he could not come down and complete the service plan. First, although the service plan agent for DCFS, the counselor said we explained everything to him, he denied that. He said he wasn't told where to go. He did complete his drug assessment. However, they never sent, according to the respondent, they never sent it back to DCFS, the completion. However, he was in prison. I know the case law, the court knows the case law, it's no excuse in the service plan. I find that, since we're talking about children, I think that doctrine should be revisited, but I didn't raise it in the brief. He didn't make visits because of that, although during the time he could make visits, he only went seven times out of 45. And the reasons given were, I'm taking care of my grandmother, I'm working, helping my father, and I just couldn't get down. He did attempt to get a mental evaluation, but that was in Chicago, and they only took walk-ins at 7 o'clock in the morning, and he just said I couldn't get downtown Chicago to get it done. In any event, he did testify he loves his children, and that he had difficulty getting down here. When he was here, DCFS claimed he didn't look like he was really interacting with the children. Well, Rome was a little child, and he was trying to bond with the child who he first met when he came down for visitation, and the other one was doing his own thing, although they showed no animosity to their father. Well, why is it against the manifest way of the evidence? Because he had difficulties completing the service plan. This was a person of merit, the respondent. While he was married, he took care of the children when the wife was doing drugs, and cared for her that, strike that, he wasn't married at that point, and he cared for her disabled husband, washed him, bathed him, etc. He did all these things. It showed that he does have a concern for people, and obviously a concern for his children. Now, as to the reasonable degree of interest on this, I've stated why he didn't complete the service plan. Moving on to the other condition for fitness, it's the basis for the child's removal. He couldn't do much on that. What could he do? It was the mother who did the drugs, and he could not make a reasonable effort to correct a condition established by the mother. Third, the last point, the reasonable progress towards the child's return, went back to the service plan, and he did not, according to the trial court, make reasonable efforts to complete the service plan. Having said all that, we move to the termination of parental rights, and the court found him to be unfit for the reasons stated, and then we move down to the best interest hearing. He did present evidence, he testified himself, and he did present evidence of his family, and they're very close, and they're very, very concerned about the members of the family. They're in Chicago, and the argument of the respondent was, look, don't terminate, let's have another substitute care, and let my family be their foster parents. There was no dispute that they were kind and loving as a family. There were many of them in the Chicago area. They all testified that the respondent loved his children and would do better. He said he would do better once he got out of prison. That's the other point. He was sentenced, a strike that he was up, and I don't know the result. He was charged with an offense in Goat County and hadn't gone to trial at the time of the hearing for fitness and best interest. He was written back by habeas corpus for the hearing. Why would you, the court mentioned that it would be disruptive to the children if, in fact, they went with his family, the blood. I think that's most important in families to stay with your bloodline if it's adequate, if you won't be abused, and they'll give you love and affection and education. Was there any evidence of a home study or anything that had been done to check into his family members? They requested it early on, Your Honor, but PCFS said, well, he wasn't making any progress to their satisfaction on the service plan, so it was a done deal. We weren't going to go up there, and he was rated unsatisfactory. Answer, yes, they did not have a home study of the family in Chicago. And if I'm recalling correctly, the children had been in their current placements for a significant period of time. At least two years, Your Honor. However, we're all, we can use our common sense and we can use our common experience. Army brats travel from place to place to place. Their father is generally gone in the military, and they grow up. Although they have great disruption in the early stages, I suggested to the court that this would not be a disruption because the children are so young. To send them back to Chicago and keep the bloodline going would not ultimately cause difficulties with the children or they would become drug addicts or unruly or something like that. There's a major difference in your military analogy. We assume that the kids in the military are with their parents going from place to place, and that wasn't the case here. Just one, generally, Your Honor. But yes, that was not the case here. You generally have the mother being the surrogate father also when the husband is deployed to Afghanistan. Taking all the evidence in its gestalt, you can find that the court did not abuse its discretion, and the judgment of the court was not against the manifest way of the evidence because it relied on the service plan, and he didn't complete it. All the respondent can do is offer his mitigation, so to speak, of why he didn't make the visits. But he did come down. They wouldn't transfer him to Chicago, by the way, because he was not doing well on the service plan. They said it was a done deal. That's the case in a nutshell. Your Honor, we're asking that the judgment of the trial court terminating the parental rights be reversed and that the best interest of the children, his judgment should be reversed, and this should be remanded back to the trial court for further proceedings. If the court has any questions. Mr. Costello, I see none, but you'll have rebuttal. Mr. Zimmerman. May it please the court. Counsel. Good morning or good afternoon, Your Honors. My name is John Zimmerman. I'm from the Fourth District Fellow Prosecutor's Office. In this case, it is the termination of parental rights, as you are aware. Counsel makes an emotional argument to you all, and I believe that the termination of parental rights, as you all know, is a very difficult decision to make. But if there is any case to do it, the State contends that it is this case. In regards to the unfitness hearing, or the fitness hearing, the evidence produced by the State was through a DCFS caseworker, Ms. Shillings. She testified that the respondent was rated unsatisfactory at both case review hearings. The evidence that she stated was he failed to complete almost every requirement that she had for him. Counsel stated that the respondent had difficulties coming to Springfield, but as Your Honor stated, they offered to pay for his service to come here. And further, he had the opportunity to complete programs up in Chicago, but yet he failed to do so. Another point I'd like to... It wasn't the evidence they offered to pay for every other visit. Yes. Not every visit, okay. But I think an important point there is the father agreed to that, Your Honor. And another statement Counsel made was that the mother called the respondent, and I feel like he didn't address the large gap between that. The children were taken in April of 2013, and the respondent was not aware that the children were taken into custody until apparently seven months later. What type of father is interested, concerned, and wants to take responsibility of his children doesn't know that his oldest son is in shelter care for the past seven months. And wasn't that contradicted by testimony from one of his relatives, that she had received a phone call and notified him sooner than that? Yes. I believe she called DCFS a couple months or a month after she found out the children were in custody, or they called her and they were asking where the respondent was, but she did not even know. And it took her until November until the respondent found out and then immediately called DCFS. But still, that's a large portion of time for the respondent to not realize what's happening to his children. At least his older child, which he knew was his at that time. Another point to make is respondent was mobile. He was in St. Louis previous to this with some type of probation violation. He's been in Springfield. One time I believe he was in Springfield, he was supposed to do a drug drop. He did not do that. He only did one out of three proposed drug drops, and I think that shows, that points towards his unfitness. Again, in regards to visitation, counsel said he only had 45 visits and attended seven. I think that's also extremely telling, regardless of the hardship that he faced, the alleged hardship. And further, he provided no form of employment to the state. He did not provide any proof of safe living environment, so that is probably one reason why DCFS did not look further into going to Chicago, the proper home for the children. Ms. Shillings, the caseworker, also testified that at no point in time was respondent ever close to having his children returned to him. And another point is he was offered visitation in January of 2014, and he didn't first make that until March. So that's another three months. I believe his child was born in April of 2013. He didn't even see his newborn until a whole year later. When he was present at the visitations, there was evidence that showed he did not interact much with his children. He was on his phone or listening to music a majority of the time. And the court, the state contends, properly found that the respondent failed to maintain a reasonable degree of interest, concern, or responsibility. Another finding was the failing to make reasonable efforts to correct the conditions. And while counsel states that he didn't have much control over the mother, the DCFS case plan was created to remedy some of the situations, which was the domestic violence, which was between the respondent and the mother prior to the children being taken away. He was supposed to attend domestic violence courses. He didn't do that. He didn't take any drug evaluation, or he did, but there was no proof of it. There's all these facts. All of this points towards a finding of unfitness, clearly and convincingly. The final finding was the respondent failed to make reasonable progress towards the return of the minors. That's the same argument. Failing to complete the DCFS service plan requirements. Failing to adequately visit with his children. The state contends that they clearly and convincingly show the respondent was unfit, and we ask this court to affirm that finding. Next at the best interest hearing, we contend the state showed by a preponderance of evidence that it was in the best interest to terminate respondent father's rights. The evidence presented to go along with the best interest factors consisted of the children being in foster home for two years, a long period of time. They were safe, secure, adequately provided for. There was no indication of any problems whatsoever with the foster families. They had their own bedroom. They had other foster siblings. They attended schools. They had friends. The youngest child even had a speech impediment, and the foster family ensured he received speech therapy weekly. Further, at the time of the best interest hearing, the respondent was incarcerated, so there was no way he would be able to provide any type of safe environment for the children to live in. And what he did ask was to put them in with his extended family, but the children have had very brief, if any, interactions with their extended family. I'm aware the older child did have some more intensive interactions with the parents, but they testified at that hearing they hadn't seen the children for an entire year. And yes, that's because they were in foster care, but still. Just all this evidence shows that it was in the minor's best interest to terminate the respondent's rights. And last but not least, I think a very large factor was the disruptive factor. If you would have the children move from their foster home that they'd been in for the past two years, they have attachments with their parents, they call them mom and dad, and then move them to Chicago to live with extended family, who they barely know, and then move them in with the respondent later once he's incarcerated, which I believe he still is incarcerated. That is just obviously not in the minor's best interest, and I believe the court agreed with that finding, as we do. So in conclusion, when looking at the best interest factors, the state showed by a preponderance of the evidence that it was in the minor's best interest to terminate the respondent father's parental rights, and we ask this court to affirm the judgment and termination of the respondent father's rights. If there's no further questions, Your Honor. I see none. Counsel, thank you very much. Mr. Costello, do you have any rebuttal? Yes, very briefly, Your Honor. First of all, DCFS does a wonderful job. They save thousands of lives of children. However, calling DCFS is like calling a black hole. You just don't get anyone to respond to you, and I say that for this reason. The grandmother, when she learned that the children were taken away from the mother, immediately called DCFS, and she notified the respondent. DCFS said, we'll get back to you. They never did. She testified after hearing she's waiting two years for DCFS to call her back. She repeatedly tried to call. That doesn't change the service plan problem, but they did try. He saw his child for the first time when he learned that DCFS had taken the youngest child. He could not write letters to his children, as suggested by DCFS, because he didn't know where the children were. He had no address of the foster parents. He couldn't make phone calls. He couldn't send Easter cards, whatever. Lastly, on common experience, I think it's a God-given right to grow up with your siblings. What the court has done here has split the children forever. One boy is in one foster home who wishes to adopt him, and the other boy is in another foster home who wishes to adopt him. They will not be raised together. Now, granted, one of the children has a half-brother in that household, but frankly, to take these children and let them grow up together in the Chicago area outweighs any, any. Mr. Costello, did the trial judge reference the fact that it understood that with its order, it was separating the two siblings?  Never. Not in any comments made or his long statement of his findings. If I recall, it is one of the factors that would be considered. Yes, it is. And I'm not suggesting that the child would go to some problem area or problem family. These are really decent people. They care, and the respondents had difficulties. His mother died, he cared for her, and at the particular time of the visitation, he was caring for his grandmother. But for those reasons, we would suggest that the judgment of fitness, unfitness, and the judgment of best interest is against the respondent, although it's for the children, be reversed. Thank you. Okay. Thanks to both of you. The case is submitted. The court is going to recess.